Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1248 | **DATE** | 11/21/2000 |
| **CASE TITLE** | Francorp, Inc. Vs. Mark Siebert et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Siebert's motion for partial summary judgment with respect to count XIII is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 2 4 2000 date docketed | |
| ✓ | Docketing to mail notices. | | | 53 |
| | Mail AO 450 form. | ED-1 FILED FOR ... | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 NOV 22 PM 3:13 | | |
| WAH | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

FRANCORP, INC., )
)
      Plaintiff, )
)
vs. ) No. 00 C 1248
)
MARK SIEBERT, MARK SIEBERT & )
ASSOCIATES, INC., also doing business )
as Siebert & Associates, Inc., and as The )
iFranchise Group, Inc., TOMMY D. )
PAYNE, DAN LEVY, LAURIE LUDES )
and JUDY JANUSZ, )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Francorp, Inc. (Francorp) brings this action alleging that defendants Mark Siebert (Siebert), Tommy D. Payne, Dany Levy, Laurie Ludes and Judy Janusz left Francorp to form a competing company, Mark Siebert & Associates (MSA), in violation of copyright, contract and tort law. Siebert, formerly the president of Francorp, now seeks summary judgment with respect to count XIII of the complaint, which accuses Siebert of tortious interference with contract. For the reasons set forth below, Siebert's motion is granted.

## BACKGROUND

Siebert began working at Francorp in 1985 and became the company's president in 1995. In 1998, Siebert grew increasingly dissatisfied with the direction the firm was taking and in August of that year he left to form MSA. While at MSA, Siebert continued to keep in touch



with his former colleagues at Francorp,[1] including Vegard Vevstad (Vevstad). Vevstad was serving as president of Francorp International at the time. Like Siebert, Vevstad was growing disgruntled with the situation at Francorp in 1998. In August or September 1999, Vevstad proposed to Francorp chairman Dan Boroian that he (Vevstad) take over the company. Boroian rejected this proposal. Seeing no future for himself at Francorp, Vevstad notified Boroian that he wanted to leave Francorp to start his own company in the near future.

Vevstad began making inquiries of his various industry contacts. One of the first people he contacted was Siebert. Siebert told Vevstad, on more than one occasion, that the two of them could not discuss any future work arrangements unless and until Vevstad had definitely decided to leave Francorp and had informed Boroian of that decision (Siebert Aff. at ¶¶ 7, 9; Vevstad Stmt. at 19-23). Siebert suspected that Vevstad was bound by some form of restrictive covenant with Francorp (Siebert Aff. at ¶ 8). Vevstad confirmed the existence of a covenant to Siebert, but assured him that his covenant was different than the one signed by many other employees and that it did not prohibit Vevstad from working for MSA after leaving Francorp (*see infra* note 3). Siebert nonetheless refused to talk business until Vevstad had officially announced his plans to Boroian.

In September or October 1999, Vevstad took the issue up again with Boroian. Vevstad states that he informed Boroian that his decision to leave Francorp was definite but that he did not expect to move on until the end of 1999 or early 2000. Boroian has a slightly different recollection of this conversation. He agrees that Vevstad informed him that he would be

---

[1] Four of Siebert's former colleagues eventually left Francorp to work with him at MSA, inciting Francorp to file this lawsuit. On October 10, 2000, we issued an order describing some of the saga in detail and granting summary judgment in favor of defendants with regard to Francorp's breach of contract claims. Francorp, Inc. v. Siebert, 2000 WL 1508245 (N.D. Ill. Oct. 10, 2000).

leaving Francorp, but states that Vevstad further promised to stay on until at least after January 1, 2000 (Boroian Aff. at ¶ 3). Vevstad denies making any commitments as to a specific departure date (Vevstad Aff. at ¶¶ 10-12; Vevstad Stmt. at 12-13).[2] In any event, sometime after this conversation, in October or November 1999, Vevstad informed Siebert that he was definitely leaving Francorp and that he had notified Boroian of his final decision. In response, Siebert relented and told Vevstad that he had a project in mind for him to do after he left Francorp (Vevstad Aff. at ¶¶ 12-13; Siebert Aff. at ¶¶ 11).

Meanwhile, Boroian was under the impression that Vevstad would not be leaving Francorp for several months. Not surprisingly, therefore, Boroian reacted strongly when Vevstad gave two weeks notice in November 1999 and announced that he would be doing work for MSA after his departure from Francorp. With both Vevstad and Kennedy in his office, Boroian called Siebert to express his anger. Over the telephone, Siebert confirmed that he had offered work to Vevstad and initially refused to renege on the promises he had made. Eventually, Vevstad indicated that he would be willing to release Siebert from any obligations, and Siebert then agreed that he would not engage Vevstad on the project he had in mind (Boroian Aff. at ¶ 7; Siebert Aff. at ¶ 12; Vevstad Aff. at ¶¶ 16-17). After that conversation ended, Boroian and Vevstad discussed Vevstad's departure from Francorp and both agreed that Vevstad would stay on until December 31, 1999 (Vevstad Aff. at ¶¶ 19-21).

Vevstad and Siebert resumed their collaboration in January of 2000, after Vevstad left Francorp. Specifically, MSA subcontracted Vevstad to complete a business plan for a client

---

[2]Mary Kennedy, another Francorp executive, concurs with Boroian on this point (Kennedy Aff. at ¶ 4), while Siebert's account jibes with that of Vevstad (Siebert Aff. at ¶ 11).

called Nancy's Catering. Boroian took offense once again. In his view, Nancy's Catering was a Francorp prospect with which Vevstad had dealings while still employed at Francorp, and therefore Siebert and Vevstad had violated Vevstad's restrictive covenant (Boroian Aff. at ¶ 8). Vevstad and Siebert dispute Boroian's contentions. First, both men deny having intended any foul play. Vevstad states that he was under the impression that his covenant with Francorp did not bar him from working for MSA, and Siebert states that although he knew Vevstad was under some form of restrictive covenant, his understanding of the terms of that agreement was based solely on Vevstad's representations to him.[3] Second, Vevstad and Siebert assert that there was no breach of the restrictive covenant in any event. They both aver that they had no contact with Nancy's Catering until January 2000, had not even discussed the prospect of working for that company until after Vevstad had left Francorp, and that Vevstad was not involved in MSA's effort to obtain the Nancy's Catering account (Vevstad Aff. at ¶¶ 13, 23-25; Siebert Supp. Aff. at ¶¶ 6-12). Therefore, Siebert and Vevstad claim that they did not breach the restrictive covenant and, even if they did, there was no intent on their part to do so.

The factual allegations described above serve as a necessary backdrop to count XIII, in which Francorp alleges tortious interference with contract against Siebert. The allegations in the complaint are not precise as to what specific contract or contracts are at issue. The

---

[3]Vevstad says that, at the time, he believed he was bound by a one-page covenant from early 1988 which limited his ability to work for Francorp clients but did not prohibit him from doing business for MSA (Vevstad Aff. at ¶¶ 3-4). He communicated this understanding to Siebert and others (Vevstad Stmt. at 39; Siebert Aff. at ¶ 10, 14; Siebert Supp. Aff. at ¶ 4). In February or March 2000, Vevstad learned from Boroian that a different covenant, executed in November 1988, in fact governed. Vevstad maintains that his work for MSA does not violate even the November 1988 restrictive covenant, but concedes that he agreed to refrain from working for Siebert and certain others until the end of 2000 and to provide a statement to Francorp in exchange for Francorp's promise not to sue him (Vevstad Aff. at ¶¶ 5-6).

evidence and arguments submitted on partial summary judgment, however, elucidate that Francorp is accusing Siebert of abetting the breach of two distinct contracts: (1) Vevstad's oral agreement to stay on at Francorp until a date at least after January 1, 2000 (the departure date agreement); and (2) the restrictive covenant Vevstad signed in November 1988 (November 1988 restrictive covenant). Siebert denies the charges with respect to both contracts and asks us to grant summary judgment in his favor on count XIII.

## DISCUSSION

To prove a claim of tortious interference with contract under Illinois law, a plaintiff must establish all of the following elements: (1) the existence of a valid and enforceable contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach of the contract by the third party caused by defendant's wrongful conduct; and (5) damages to plaintiff resulting from the breach. HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 545 N.E.2d 672, 676 (Ill. 1989); Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). On the other hand, in order to defeat such a claim on summary judgment, a defendant need only show that one of these elements is not supported by a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Covering all his bases, Siebert attacks count XIII on a number of different grounds. We agree with at least some of Siebert's arguments and therefore need not address all of the issues he raises in his motion. Since count XIII is based on two separate contracts, it makes sense for us to divide our discussion of Siebert's critique accordingly.

I. <u>Departure Date Agreement</u>

Francorp first claims that Siebert tortiously interfered with Vevstad's commitment to stay on at Francorp "until at least a date after January 1, 2000" (Boroian Aff. at ¶ 3). It is questionable whether such a commitment existed in the first place -- Vevstad, for one, states that he made no promises regarding his departure date from Francorp. Even if he made a valid oral contract with Boroian, there is also some doubt as to whether Vevstad, who left Francorp on December 31, 1999, materially breached the departure date agreement and, if he did breach it, whether that infraction caused any damage to Francorp. We set these concerns aside, however, because it is clear that Francorp cannot show that Siebert knew of the departure date agreement or that he intentionally induced Vevstad to breach that obligation.

Siebert's knowledge regarding the departure date agreement consists of two layers. Independently, Siebert was aware that Francorp's workforce generally consisted of at-will employees. Siebert's own restrictive covenant with Francorp plainly stated that he was employed on an at-will basis (Cplt. at Exh. A). By the fall of 1999, Siebert had recruited a number of former Francorp colleagues and was aware that they had been at-will employees at Francorp as well (Cplt. at Exhs. B-E).[4] On his own, therefore, Siebert had the well-founded understanding that Vevstad could leave Francorp whenever he chose to do so. In addition, Siebert had a number of conversations with Vevstad, which only served to confirm Siebert's independent conclusions. *See* <u>Cross v. American Country Ins. Co.</u>, 875 F.2d 625, 630 (7th Cir. 1989) (holding that contracting party's discussions with defendant were relevant to

---

[4]The November 1988 restrictive covenant similarly provides that Vevstad was an at-will employee while at Francorp (Kennedy Aff. at Exh. A).

determining whether defendant had knowledge of the contractual obligation). Vevstad swears,[5] "I did not tell Mark Siebert that I had made any commitment to stay at Francorp for any particular time, because, of course, I had not made any such commitment to Francorp" (Vevstad Aff. at ¶ 12). Siebert corroborates Vevstad's affidavit, stating that Vevstad "indicated that he had told Boroian that he was definitely leaving Francorp, and that he would be leaving by the first of the year" (Siebert Aff. at ¶ 11).

Francorp attempts to rebut this evidence merely by offering its own gloss on Siebert's affidavit. Francorp argues that Siebert's statement reflects that he was aware of Vevstad's promise to stay at Francorp until (at least) January 1, 2000. But "leaving by the first of the year" does not mean "staying until the first of the year." Siebert's statement simply does not carry the meaning Francorp seeks to ascribe to it. Siebert understood, both from his personal review of Francorp's restrictive covenants and from his conversations with Vevstad, that Vevstad was an at-will employee who expected to, but was not committed to, stay at Francorp until January 1, 2000. We cannot conclude that Siebert knew of the purported departure date agreement based on these facts.

Even if Siebert suspected that there was a departure date agreement, there is no evidence that he intended to induce Vevstad to breach that commitment. Inducement "requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." In re Estate of Albergo, 656 N.E.2d 97, 103 (Ill. App. 2 Dist. 1995) See R.E. Davis Chemical Corp. v. Diasonics, Inc., 826 F.2d 678, 687 (7th Cir. 1987)

---

[5] Vevstad's view, as he repeatedly has stated under oath (Vevstad Stmt. at 12-13; Vevstad Aff. at ¶¶ 10-11), is that there was no departure date agreement. That Francorp disputes this factual allegation bears little relevance, for it is undisputed that Vevstad conveyed his subjective understanding to Siebert.

(requiring "more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another"), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991). Siebert did not engage in such culpable conduct here. When Vevstad approached him regarding potential work engagements, Siebert refused to talk business unless and until Vevstad officially announced that he definitely was leaving Francorp. Siebert relented only after Vevstad assured him that he had notified Boroian of his final decision to leave Francorp and that he would not be violating his restrictive covenant by accepting work with MSA. Siebert and Vevstad both attest to the above-described version of events (Siebert Aff. at ¶¶ 7-11; Vevstad Stmt. at 19-23), and Francorp has not introduced evidence to contradict their statements. Siebert was careful not to involve himself in the (end of the) relationship between Francorp and Vevstad. His behavior cannot be described as a campaign to induce Vevstad to leave Francorp before the end of 1999, let alone an intentional effort to do so.

The record establishes that Siebert had no knowledge of the purported departure date agreement. We need not rely solely on what Siebert knew or did not know, however, because there is also no evidence that Siebert intentionally induced a breach of the agreement, even if it existed and he knew about it. Therefore, insofar as Francorp's tortious interference with contract claim is based on Vevstad's purported agreement to stay on until after January 1, 2000, we hold that Francorp has failed to satisfy elements 2 and 3 of the test.

## II. November 1988 Restrictive Covenant

Francorp also claims that Siebert abetted the breach of the November 1988 restrictive covenant between Vevstad and Francorp. As with the departure date agreement, we have doubts as to a number of issues regarding this contract, especially with respect to whether

Siebert had knowledge of the specific terms of the covenant at issue (*see supra* note 3). We are confident that Vevstad did not breach the November 1988 restrictive covenant, however, and therefore limit our discussion to element 4 of the tort claim.

According to Francorp, the interactions between Vevstad, Siebert/MSA and Nancy's Catering violated the November 1988 restrictive covenant. We must first look to the language of the contract in order to assess the merits of this argument. In relevant part, the covenant provides that for a period of one year after leaving the company, Vevstad cannot do the following:

> (1) induce or influence, divert or take away or attempt to divert or take away, and ... call upon or solicit, or attempt to call upon or solicit, or accept or engage in employment or a consulting position with any of the prospective, current, or prospective post-development customers or patrons of Francorp for whom Employee has performed, will perform, or Francorp and/or its affiliates have proposed to perform services as delineated in Employee's job description at the time consulting services were performed or will be performed by Employee on behalf of a client, customer or patron of Francorp. ...;
>
> (2) provide "competitive services" to any person, firm, corporation or entity with whom Employee dealt, or on whose account Employee worked, at any time during Employee's last three (3) years of employment with Francorp;
>
> (3) cause or attempt to cause any prospective customer of Francorp with whom Employee dealt, or on whose account Employee worked, at any time during Employee's last three (3) years of employment with Francorp, or any actual customer of Francorp as of the termination date of employment (whether or not Employee dealt with or worked on the account of such customer), to divert, terminate, limit or in any manner modify or fail to enter into, any actual or potential business relationship with Francorp;
>
> * * * *
>
> (5) employee covenants that she/he will not take advantage of his/her position as an Employee of Francorp and inquire patronage of

> Francorp's clients and persons whose goodwill and acquaintance she/he made while in the employment of Francorp, and entice or attempt to entice any clients or prospective clients to engage in services of Employee as such would constitute unfair dealing.

(Kennedy Aff. Exh. A). In sum, these clauses provide that for one year after leaving Francorp, Vevstad is barred from soliciting or accepting employment with any current or prospective Francorp client; providing competitive services to any client with whom Vevstad worked during his last three years at Francorp; causing any prospective customer with whom Vevstad dealt during his last three years at Francorp or any current Francorp client to divert its business away from Francorp; and seeking patronage of Francorp clients or other companies with whom Vevstad dealt while at Francorp in a manner that would constitute unfair dealing.[6] Testing Vevstad's behavior against these provisions, we find that there has been no breach of the November 1988 restrictive covenant.

With respect to the first provision, Francorp has not shown that Vevstad solicited work from or accepted employment with Nancy's Catering. While MSA and Francorp competed with each other in January 2000 (and maybe earlier) for the Nancy's Catering account, Vevstad had no role in that competition. The evidence on this point is uncontroverted. Vevstad specifically states that he had nothing to do with the marketing of MSA's services to Nancy's Catering and, moreover, that he did not even begin his subcontracting work for MSA until after it had already landed the Nancy's Catering account (Vevstad Aff. ¶¶ 13, 23-24).

---

[6] We harbor significant doubts as to the validity of the November 1988 restrictive covenant given the breadth of the activity it seeks to prohibit. *See* Eichmann v. National Hospital and Health Care Services, Inc., 719 N.E.2d 1141, 1146-49 (Ill. App. 1 Dist. 1999) (refusing to enforce overbroad restrictive covenant), *appeal denied*, 724 N.E.2d 1267 (Ill. 2000). But since we hold that Vevstad did not breach the covenant even as it is written, we need not explore these doubts and we will assume for the sake of argument that the covenant is valid and enforceable.

Siebert says the same thing (Siebert Supp. Aff. at ¶¶ 9-12). What is more, the president of Nancy's Catering, James Turley, agrees with Vevstad and Siebert, stating that he had no contact at all with Vevstad until after Nancy's Catering had hired MSA (Turley Aff. at ¶¶ 8, 13). Francorp presents no evidence contradicting the affidavits of Vevstad, Siebert and Turley on this issue. Nor does Francorp contend that Vevstad accepted employment with Nancy's Catering. What Vevstad did do was to perform subcontracting work for MSA on the Nancy's Catering account, but that does not violate the terms of this first provision.

The other three relevant provisions of the November 1988 restrictive covenant are triggered only if Vevstad had dealings with Nancy's Catering while he was still employed at Francorp. The evidence indicates that he did not. The affidavits of Vevstad and Turley are in agreement on this point. Both men recall that Vevstad had no contact with Nancy's Catering until January 2000, after Vevstad had already left Francorp (Vevstad Aff. at ¶ 25; Turley Aff. at ¶¶ 3, 9, 13). The only contrary evidence Francorp presents is Boroian's rather weak statement that "it is my belief that Vegard Vevstad met representatives of [Nancy's Catering] when they visited Francorp's office in 1999" (Boroian Aff. at ¶ 8). The record reflects, however, that Nancy's Catering did not send any representatives to Francorp's office until after January 1, 2000 (Turley Aff. ¶¶ 3, 6-9). In any event, Francorp does not present an affidavit based on first-hand knowledge or any other evidence to corroborate Boroian's uncertain recollection. Speculation is no defense to a summary judgment motion. *See* Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 931-32 (7th Cir. 1995). Thus, Francorp has not shown that Vevstad breached clauses 2, 3 and 5 of the November 1988 restrictive covenant.

Having failed to establish that Veystad's conduct violated any of the relevant provisions of the November 1988 restrictive covenant, Francorp cannot sustain a claim for tortious interference based on that contract. Francorp has not presented material evidence sufficient to support either leg of its tortious interference theory. There is not enough here to implicate Siebert in connection with either the departure date agreement or the November 1988 restrictive covenant. Therefore, Francorp cannot proceed further with count XIII.

## CONCLUSION

For the reasons set forth below, Siebert's motion for partial summary judgment with respect to count XIII is granted.

_Nov. 21_, 2000

JAMES B. MORAN
Senior Judge, U. S. District Court